IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

GENERAL INSURANCE COMPANY OF    *
AMERICA                         *
                                *
          v.                    *   Case No. WMN-12-3307
                                *
THE WALTER E. CAMPBELL COMPANY, *
INC. <u>et al.</u>             *
                                *

   *    *    *    *    *    *    *    *    *    *    *    *

**<u>MEMORANDUM</u>**

Before the Court are the following dispositive motions:
Motion for Partial Summary Judgment, Reconsideration, and
Modification filed by the Walter E. Campbell Company, Inc.
(WECCO), ECF No. 337; Motion for Final Summary Judgment filed by
Property and Casualty Insurance Guaranty Corporation (PCIGC),
ECF No. 339; Motion for Summary Judgment filed by United States
Fire Insurance Company (U.S. Fire), ECF No 342; Motion for
Partial Summary Judgment filed by Continental Insurance Company
(Continental), ECF No. 345; and Motion for Summary Judgment
Regarding Exhaustion and Defense Costs filed by St. Paul Fire
and Marine Insurance Company (St. Paul), ECF No. 352.  In
addition, there are two pending Motions to Strike: one by St.
Paul, ECF No. 351; and one by U.S. Fire, ECF No. 380.[1]  Upon

---

[1] Also pending are multiple motions to seal submitted by the
parties.  ECF Nos. 336, 341, 344, 347, 348, 358, 361, 364, 367,
370, 379, 383, and 384.  These motions are consistent with the

review of the filings and the applicable law, the Court

determines that no hearing is necessary, Local Rule 105.6, and

that WECCO's motion for partial summary judgment will be denied

and the remaining motions for summary judgment will be granted.

St. Paul's motion to strike will be granted in part and denied

as moot in part, and U.S. Fire's motion to strike will be denied

as moot.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This action involves an insurance coverage dispute between

WECCO and several of its insurers.  WECCO is a company which,

for decades, engaged in the business of handling, installing,

disturbing, removing, and selling asbestos-containing insulation

materials.  As a result, WECCO has been named in hundreds of

personal-injury asbestos lawsuits and its insurers have paid out

millions of dollars in claims.  The insurers involved in this

suit assert that the policies that they issued provided coverage

for periods of time after WECCO ceased selling or installing

those asbestos-containing products.  On that basis, they contend

that claims under their policies are "completed operations"

hazard claims which are subject to aggregate limits of liability

that have now been exhausted.

---

terms of the Protective Order entered by the Court to protect
confidential and proprietary business information.  ECF No. 215.
The motions to seal will be granted.

This action has a long and drawn-out procedural history in which the Court has been called upon to make numerous rulings. See ECF Nos. 131, 146, 199, 251, 267, 282, 312, and 329. Several of those earlier rulings came in response to WECCO's efforts to avoid, at all costs, binding precedent in the Fourth Circuit that resolved the major coverage issues in this action in a manner that is counter to WECCO's desired resolution of those issues. At one point, WECCO contended that "the law of the District of Columbia applies to some or all of the issues in this dispute," ECF No. 104-1 at 15, despite the fact that it was clear that Maryland law would govern WECCO's claims. That contention, however, led to the filing of a parallel action in the Superior Court for the District of Columbia on January 14, 2013, an action that was subsequently stayed in favor of this action.

After discovery confirmed that there was no support, whatsoever, for the contention that WECCO's claims were not indeed governed by Maryland law, WECCO sought to have the issues submitted as certified questions to the Maryland Court of Appeals, despite the fact that this Court had previously held that it would be an abuse of discretion to certify these same well-settled issues to that court. See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa v. Porter Hayden Co., 331 B.R. 652, 658 n.8 (D. Md. 2005). Notwithstanding its reluctant acknowledgment

3

that Maryland law governs this action, WECCO has twice suggested

that that a D.C. court could better resolve these issues than

this Court, ignoring the clear teaching of the Fourth Circuit

that "a particular state's interests are 'better served by

having the coverage issues decided by a federal court sitting in

[that state], rather than in a state court sitting in [a

different state].'"  Great Am. Ins. Co. v. Gross, 468 F.3d 199,

209 (4th Cir. 2006)).

The motivation behind WECCO's persistent efforts to avoid

Fourth Circuit precedent is made abundantly clear in the pending

summary judgment motions.  The binding Fourth Circuit precedent,

when applied to the undisputed facts in this action, results in

the defeat of WECCO's claims.  WECCO's somewhat spurious and

often poorly supported arguments in the pending motions serve to

highlight the fundamental lack of merit of those claims.

Having determined that the coverage issues in this action

will be resolved by this Court applying Fourth Circuit

precedent, this Court has in some of its more recent rulings

issued several declarations on those coverage issues,

declarations which are relevant to the pending dispositive

motions.  In a May 26, 2015, Memorandum and Order, the Court

issued the following declarations:

(a) Maryland law governs the interpretation of the insurance policies issued or allegedly issued to WECCO by Certain Insurers;[2]

(b) Bodily injury that occurs during an insurer's policy period, and that arises from an operation that concluded prior to the inception of the policy period, falls within the "completed operations" hazard of that policy and therefore is subject to the aggregate limits of each such policy; and

(c) To avoid the application of the aggregate limit of any particular policy, WECCO bears the burden of proving that the bodily injury that occurred during that policy's policy period arose from asbestos exposure during a WECCO operation that was ongoing during such policy period.

ECF No. 252 at 2.

As noted above, during the course of this litigation, several of the insurers have settled their claims with WECCO. Regarding the ongoing post-settlement obligations of the parties relative to the underlying asbestos litigation, this Court made the following declarations in a May 12, 2016, Memorandum and Order:

(i) Any judgment or award obtained by WECCO against any other insurer shall be automatically reduced by the amount, if any, that a Court determines by judgment [the Settled Insurer] would have been liable to pay such other insurer as a result of that insurer's claim so that the claim by that insurer against [the Settled Insurer] is thereby satisfied and extinguished;

---

[2] In previous briefing and rulings, the collective term "Certain Insurers" was used to designate the insurers arguing that the limits of their policies had been exhausted.  As the case has progressed, several of those insurers have settled with WECCO and have been dismissed.

(ii) WECCO will be obligated to participate in the defense and indemnity of WECCO to the same extent that [the Settled Insurer] would be obligated to participate under applicable law; and

(iii) WECCO and [the Settled Insurer] are ORDERED to deposit the settlement payment in a qualified settlement fund [(the WECCO QSF)], pending resolution of substantive issues relating to [the Settled Insurer's] responsibility, if any, to pay defense and indemnity costs;

ECF No. 312 at 4 (quoting ECF No. 199 at 10-12 and ECF No. 252 at 3).

In that same Memorandum and Order, the Court addressed how liability in the underlying asbestos litigation should be allocated amongst the various insurers and WECCO.  The Court declared:

(a) Any indemnity obligation an insurer may have to WECCO with respect to an asbestos bodily injury suit is to be allocated pro rata based on such insurer's triggered time on the risk as compared to the "Allocation Period," which is the entire period during which the claimant's bodily injury occurred.  The Allocation Period starts with the date of a claimant's first WECCO-related exposure to asbestos and ends with the manifestation of the claimant's asbestos-related disease, exclusive of any periods for which WECCO establishes that insurance for asbestos claims was commercially unavailable to WECCO for procurement.

(b) WECCO must pay all pro rata shares of any judgment or settlement not allocable to Certain Insurers.  This includes indemnity allocable to any period in the Allocation Period for which (i) the insurance procured by WECCO has been exhausted; (ii) the insurance procured by WECCO was issued by one or more insurers that are insolvent; (iii) the insurance procured by WECCO was issued by an insurer with whom WECCO has reached a settlement; and/or (iv) WECCO failed to procure insurance, unless WECCO establishes that

insurance for asbestos claims was commercially
unavailable to WECCO for procurement during that
period.

ECF No. 313 ¶ 3.

Some of this Court's most recent rulings have addressed

discovery issues.  On November 5, 2015, the Court issued an order

setting a timetable for discovery related to the exhaustion of

aggregate limits and the filing of dispositive motions on those

issues.  ECF No. 282.  On June 1, 2016, the Court issued a ruling

granting St. Paul's motion to compel and ordering WECCO to

supplement multiple discovery responses related to critical issues

that the Court found to be seriously inadequate.  ECF No. 329.  In

that ruling, the Court also noted, at least as to WECCO's claims

against St. Paul, that "[g]iven that WECCO was a participant in its

own defense and received contemporaneous communications concerning

the insurers' indemnity payments throughout the period in question

and that St. Paul produced its payment records to WECCO more than a

year and a half ago, . . . WECCO has had more than adequate

opportunity to articulate the factual basis for its contention that

St. Paul has not exhausted the aggregate limits of its policies."

Id. at 3.

With discovery as to the exhaustion of aggregate limits now

complete, WECCO, St. Paul, U.S. Fire, and Continental have filed

motions for summary judgment on that issue.  In addition, as

explained below, PCIGC has filed a motion for summary judgment

contending that WECCO has no evidence to establish that PCIGC is

liable for claims arising out of an insurance policy issued by a now insolvent insurer, Centennial Insurance Company (Centennial).

## II. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)).  The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment.  Id. at 252.  The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party, Scott v. Harris, 550 U.S. 372, 378 (2007), who may not rest upon the mere allegations or denials of his pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial.  Fed. R. Civ. P. 56(c)(1).

Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit.  Fed. R. Civ. P. 56(c)(4).

## III. DISCUSSION

The pending dispositive motions all relate to WECCO's Amended Third Party Complaint and Cross Claims.  ECF No. 268. Count I, which was brought against St. Paul, U.S. Fire, Continental, and PCIGC, is for a declaratory judgment to resolve the controversies as to whether the insurers have properly allocated claims that they paid to the aggregate limits of their policies and whether PCIGC is liable under policies issued by certain now insolvent insurers.[3]  In Count II brought against St. Paul, U.S. Fire, and Continental, WECCO asserts that those insurers breached their insurance contracts by failing to pay for or reimburse WECCO for the defense costs associated with the underlying asbestos suits.  In Count III, brought against St. Paul and U.S. Fire, WECCO asserts that those insurers breached their insurance contracts by improperly allocating settled operations claims as settled completed operations claims and

_____

[3] Count I also sought a declaration as to whether the asbestos suits brought against WECCO arose out of multiple occurrences or a single occurrence.  Because none of the insurers took the "single occurrence" position, that appears to be a moot issue.

thus prematurely exhausting the aggregate limits of their policies.

## A. St. Paul Policies

Two of the pending dispositive motions relate to policies issued by St. Paul.  The first, WECCO's motion for partial summary judgment, reconsideration, and modification, challenges determinations made in this Court's May 26, 2015, Memorandum and Order.  In this motion, which was filed on July 1, 2016, WECCO argues, for the first time in this litigation, that the policy language in the St. Paul primary policies is "materially different" from the language that the Court interpreted in its May 26, 2015, Memorandum.  ECF No. 338 at 2.  Notably, WECCO does not seek reconsideration of the Memorandum and Order with respect to any of the policies issued by the other insurers, nor does it challenge the Court's determination that In re Wallace & Gale Co., 385 F.3d 820 (4th Cir. 2004), and National Union Fire Ins. Co. of Pittsburgh, Pa. v. Porter Hayden Co., 331 B.R. 652 (D. Md. 2005) apply to the interpretation of those other policies.  ECF No. 337 at 1 n.2.[4]

In opposing this motion, St. Paul argues, inter alia, that the motion must be denied as untimely as it was filed more than a year after the issuance of the order that the motion is now

---

[4] WECCO does continue to reserve the right to challenge those determinations on appeal.  Id.

challenging.  As an interlocutory order, this Court's May 26, 2015, Order is subject to the provisions of Rule 54(b) of the Federal Rules of Civil Procedure which provides that such orders "may be revised any time before the entry of a judgment adjudicating all the claims."  The May 26, 2015, Order, however, is also subject to the dictates of Local Rule 105.10 which provides that "any motion to reconsider any order issued by the Court shall be filed with the Clerk not later than fourteen (14) days after entry of the order."

In its motion, WECCO anticipated St. Paul's timeliness argument in a footnote.  ECF No. 338 at 10 n.4.  While acknowledging that Local Rule 105.10 mandates that motions for reconsideration be filed within 14 days, WECCO notes that Local Rule 604 permits this Court to suspend the provisions of any of its Local Rules for "good cause shown."  Id.  WECCO then notes that "[t]his court has previously held that a district court's error of law in applying the correct contract terms constitutes good cause under Local Rule 604 for allowing a motion for reconsideration more than fourteen days after entry of the order."  Id. (citing Harper v. Anchor Packing Co., Civ. No. 12-460, 2014 WL 3828387, at *1-2 (D. Md. Aug. 1, 2014)).

In Harper, the motion for reconsideration that was granted was filed only 15 days beyond the time permitted under Local Rule 105.10.  Harper was an asbestos injury case and the

11

contract term that the Court's erred in applying was the
particular type of asbestos product referenced in the
defendant's invoices.  Those invoices indicated that the
defendant had shipped "asbestos-containing Johns-Mansfield
<u>packing</u>" to the plaintiff's workplace, but the Court
mischaracterized the invoices as indicating that the defendant
shipped "asbestos-containing Johns-Mansfield <u>pipe covering</u>."
2014 WL 3828387, at *2 (emphasis added).  Based on that
mischaracterization, the Court denied the defendant's motion for
summary judgment, concluding that, when considering those
invoices in conjunction with deposition testimony that the
plaintiff had been exposed to Johns-Mansfield pipe covering,
there was a genuine dispute of material fact as to whether
exposure to Johns-Mansfield pipe covering was a substantial
factor in causing the plaintiff's injuries.  Civ. No. GLR-12-
460, ECF No. 608 at 5.  After being made aware of its misreading
of the invoices through the motion to reconsider that ruling,
the Court granted summary judgment for the defendant, noting
that there was no evidence in the record that Johns-Mansfield
packing was used at plaintiff's workplace.  Significantly, the
misconstrued invoices were injected into the litigation for the
first time with the plaintiff's opposition to the motion for
summary judgment.  <u>See</u> Civ. No. GLR-12-460, ECF No. 582 at 3-5
(Reply in Support of Summary Judgment Motion) (complaining that

the invoices were not disclosed in discovery but first submitted with the plaintiff's opposition).

Here, WECCO's motion for reconsideration was not filed just 15 days late, but more than a year and 15 days late. Furthermore, as St. Paul notes, the meaning of the "completed operations" provisions in all of the insurers' policies has been one of the primary issues in this litigation since its inception and WECCO has filed no fewer than six briefs on this same issue. Also of significance, unlike the invoices in Harper, the St. Paul policies are not recent or last minute submissions into this litigation.  WECCO was provided with the St Paul policies that it now claims contain "materially different" provisions at least as early as October of 2014, when the policies were submitted as attachments to an earlier motion filed by St. Paul for summary judgment.  See, e.g., ECF No. 220-23 at 61 (GENINS_008281).  Thus, WECCO could have made these same arguments it now advances more than a year ago, before the Court issued its May 26, 2015, Memorandum and Order.  WECCO offers no explanation, whatsoever, as to why it did not do so. Remarkably, in its reply memorandum, WECCO makes no further argument for a showing of good cause for the untimely filing of its motion.

Under these circumstances, the Court cannot conclude that WECCO has shown good cause for waiting until now to finally read

13

the language of the St. Paul policies and argue that the language in those policies has a different meaning than the language analyzed in Wallace & Gale, in Porter Hayden, and by this Court in its previous memorandum.  See, Coulibaly v. J.P. Morgan Chase Bank, N.A., Civ. No. 10-3517, 2011 WL 6837656, at *2 (D. Md. Dec. 28, 2011) (denying the plaintiffs' untimely Rule 54(b) motion for lack of good cause shown where the "motion could not prevail because they seek either to relitigate the same issues addressed by the opinion deciding the motions to dismiss or to introduce new arguments that they failed to raise previously.  These are not appropriate grounds for reconsideration.").

Even if timely filed, the motion would be denied.  In denying a timely motion to reconsider, this Court has concluded that, "[a]lthough there is a policy in the Fourth Circuit in favor of claims being resolved on their merits, see Dow v. Jones, 232 F. Supp. 2d 491, 494 (D. Md. 2002), it does not follow that the failure to reach the merits necessarily constitutes a manifest injustice, as Plaintiff appears to suggest.  This is particularly true where, as here, Plaintiff advances an argument in her motion for reconsideration that could have been raised in her prior motion, but was not." Reyazuddin v. Montgomery Co., Md., Civ. No. 11-0951, 2012 WL 642838, at *3 (D. Md. Feb. 27, 2012).  See also, MBR Constr.

<u>Servs., Inc. v. Liberty Mut. Ins. Co.</u>, Civ. No. 15-14, 2016 WL 3190650, at *1 ("[A] motion to reconsider is not proper where it only asks the Court to rethink its prior decision, or presents a better or more compelling argument <u>that the party could have presented in the original briefs on the matter</u>.") (emphasis added, citation omitted).

The Court will deny as untimely WECCO's motion for reconsideration and modification of this Court's May 26, 2015, Order.[5]  Because WECCO's request for the entry of partial summary judgment in its favor is premised on its alternative interpretation of the St. Paul policies, that request will also be denied.

The second motion related to the St. Paul policies is St. Paul's motion for summary judgment regarding exhaustion and defense costs.  In that motion, St. Paul asks the Court to resolve four dispositive questions.  First, St. Paul seeks a declaration that its indemnity payments for eight specific asbestos bodily injury claims[6] were properly classified as

---

[5] In its motion to strike, ECF No. 351, St. Paul moves to strike the transcript of St. Paul's Rule 30(b)(6) deposition, portions of which WECCO cites to support an alternative interpretation of the language of the St. Paul primary policy.  Because the Court finds that WECCO's motion for reconsideration is untimely, it will deny that portion of St. Paul's motion to strike as moot.

[6] In its discovery responses, WECCO identified eight claims as improperly categorized: <u>Sandra D. Donahue, as P.R. of the Estate of Bennie Casper, Jr. (dec.), et al. v. WECCO, et al.</u>, No.

completed operations claims subject to the aggregate limit in its policies.  Second, St. Paul seeks a declaration that the aggregate limits of its policies have been exhausted.  Third, St. Paul asks the Court to find that WECCO's breach of contract and declaratory judgment claims, as to its primary policies, are barred by the applicable three year statute of limitations.  And finally, St. Paul seeks summary judgment on WECCO's claim that St. Paul has failed to fully defend or reimburse WECCO's defense cost in the underlying asbestos suits.

The resolution of the first two questions flows directly from undisputed facts in the record, the admissions of WECCO, the Court's previous declarations, and the Court's determination, as explained above, not to reconsider or to

---

24X03001190 (Baltimore City Cir. Ct.); Richard S. McGovern, et al. v. WECCO, Nos. 24X05000169, 24X03000234 (Baltimore City Cir. Ct.); Leo F. Robertson, et al. v. WECCO, et al., No. 24X03000014, (Baltimore City Cir. Ct.); Charles E. Squires v. WECCO, et al., No. 24X11000189 (Baltimore City Cir. Ct.); Robert Burns, et al. v. WECCO, et al., No. 24X09000408 (Baltimore City Cir. Ct.); Mary B. Dunston, as Executrix of the Estate of Eugene M. Dunston (dec.), et al. v. WECCO, et al., No. 24X0500690 (Baltimore City Cir. Ct.), Sherri Millar, as P.R. of the Estate of Thomas Millar (dec.), et al. v. WECCO, et al., No. 24X07000106 (Baltimore City Cir. Ct.); Norma Young, as P.R. of the Estate of James Young (dec.), et al. v. WECCO, et al., No. 24X08000343 (Baltimore City Cir. Ct.).

In its opposition, however, WECCO does not address St. Paul's arguments related to the Burns, Dunston, Millar and Young cases, and thus appears to have abandoned its claim that these claims were mischaracterized.  See Grant-Fletcher v. McMullen & Drury, P.A., 964 F. Supp. 2d 514, 526 (D. Md. 2013) (summary judgment proper where non-movant abandoned claim by failing to address movant's arguments).

modify those declarations.  First, there is no real dispute that WECCO had ceased the sale and installation of all asbestos products by no later than 1972.  As this Court observed, WECCO repeatedly made this assertion in the underlying litigation and when applying for the insurance policies at issue.  ECF No. 251 at 23.  In its discovery responses in this litigation and in its Rule 30(b)(6) deposition, WECCO has acknowledged that it has no evidence that it conducted any asbestos-related operations during the periods that St. Paul policies were in force.  ECF No. 353-1 at Fourth Supp. Resp. to Interrog. No. 7; ECF No. 353-4, WECCO's Rule 30(b)(6) Dep. at 67-73.[7]

There is also no dispute as to the time period in which the St. Paul policies were in force or the collective aggregate limit of the St. Paul primary and umbrella policies.  St. Paul issued WECCO primary policies covering the period April 1, 1979 through April 1, 1983.  Each of those policies included a "total

---

[7] With its motion, WECCO submitted deposition transcripts, discovery responses, complaint and briefs from the underlying asbestos cases.  St. Paul moved to strike those materials on the grounds that they are inadmissible hearsay, unverified, unauthenticated, and irrelevant.  ECF No. 371 at 1-6.  The Court agrees on each of those grounds.  As to relevance, <u>allegations</u> in the underlying action might have some relevance as to a duty to defend under the St. Paul policies, but not as to a duty to indemnify.

U.S. Fire filed a similar motion to strike similar evidence offered by WECCO in opposition to its motion.  ECF No. 380. Because the Court finds that WECCO's claims against U.S. Fire fail on other grounds, it will deny U.S. Fire's motion to strike as moot.

limit" provision of $500,000 for each policy year so these
primary policies provided an aggregate limit of $2 million.  St.
Paul also issued WECCO umbrella excess policies covering the
three years from April 1, 1980 through April 1, 1983.  Each of
these contains a "Limit of Liability" provision which sets forth
an aggregate limit of $10 million for all occurrences during
each policy year arising out of either the products hazard or
completed operations hazard or both combined.  Thus, the total
aggregate limit for all of the St. Paul policies was $32
million.

The Court has previously established, and has now
reaffirmed, that the following declarations apply to St. Paul's
primary policies:

> Bodily injury that occurs during an insurer's policy
> period, and that arises from an operation that
> concluded prior to the inception of the policy period,
> falls within the "completed operations" hazard of that
> policy and therefore is subject to the aggregate
> limits of each such policy; and

> To avoid the application of the aggregate limit of any
> particular policy, WECCO bears the burden of proving
> that the bodily injury that occurred during that
> policy's policy period arose from asbestos exposure
> during a WECCO operation that was ongoing during such
> policy period.

ECF No. 252 at 2.  In this instant motion for summary judgment,
St. Paul asserts that its umbrella policies also fall within the
ambit of those declarations and WECCO does not dispute that in
its opposition.  The relevant language in the umbrella policies

is, in fact, the same as the language interpreted by this Court
in its May 26, 2015, Memorandum.

As to the remaining four disputed claims that WECCO
identified as improperly subjected to the aggregate limits in
the St. Paul policies, St. Paul notes that there is no
admissible evidence that these plaintiffs were actually exposed
to any asbestos-related WECCO operations.  Regardless, even the
alleged exposures to alleged WECCO asbestos containing products
were alleged to have occurred between 8 and 13 years before any
St. Paul policy went into effect.  Thus, the undisputed evidence
establishes that St. Paul properly classified these claims as
completed operations claims subject to the aggregate limit in
its policies.

In support of its assertion that it has exhausted the
bodily injury aggregate limits by the payment of claims, St.
Paul submits the Affidavit of Irene Muse, a Regional Director
for The Travelers Indemnity Company (Travelers)[8] and the
individual responsible for overseeing and managing the WECCO
claims.  ECF No. 353-14.  Muse attached to her affidavit the
"Loss Runs" for the St. Paul primary policies, Exhibit 1 to Muse
Aff., ECF No. 353-15, and the "Loss Runs" for the St. Paul
umbrella policies, Exhibit 2 to Muse Aff., ECF No. 353-16.  Muse

_____

[8] Travelers and St. Paul became corporately affiliated in 2004
and the St. Paul computer system was integrated into Travelers'
computer system.

explains in her affidavit how the Loss Runs were generated from the Travelers' computer system. Because indemnity payments were not tracked in the computer system by claimant name until 2009, not all of the specific claimants were identified in the Loss Runs. To provide that information, Muse had a paralegal prepare a summary chart identifying the specific claimants and settlement amounts which were not identified on the Loss Runs. Exhibit 12 to Muse Aff., ECF No. 353-26. Muse explains that the actual payment records used in the preparation of that summary were all produced to WECCO nearly two years ago as part of the St. Paul document productions. Muse Aff. ¶ 34.

WECCO raises a number of challenges to the exhaustion evidence submitted by St. Paul. As to the Loss Runs, WECCO suggests that: they are inadmissible hearsay; they are not admissible under the business record exception to the hearsay rule because Muse is not a "qualified witness" as required under Rule 803(6) of the Federal Rules of Evidence; and, they are otherwise unreliable. As to the summary chart, Exhibit 12, WECCO suggests it is also inadmissible hearsay, it is not admissible as a business record, it should be stricken because it was not produced in discovery, and finally, it is inadmissible because "[n]either the Muse Affidavit nor Exhibit 12 identify by Bates-number a single, admissible document that St. Paul's 'paralegal' relied upon to create it." ECF No. 357

at 9-11.   The Court finds each of these challenges to be wholly
without merit.

Under Rule 803(6), a record is admissible under the "Record
of a Regularly Conducted Activity" exception to the hearsay rule
if:

> (A) the record was made at or near the time by — or
> from information transmitted by — someone with
> knowledge;
>
> (B) the record was kept in the course of a regularly
> conducted activity of a business, organization,
> occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that
> activity;
>
> (D) all these conditions are shown by the testimony of
> the custodian or another qualified witness, or by a
> certification that complies with Rule 902(11) or (12)
> or with a statute permitting certification; and
>
> (E) the opponent does not show that the source of
> information or the method or circumstances of
> preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6).   In her affidavit, Muse states that the
payment information reflected in the Loss Runs was recorded at
or near the time of the payments reflected therein by company
claims personnel with knowledge of the facts; that the records
from which the Loss Runs were generated are kept in the regular
course of company business; and that it is the company's regular
business practice to make the records from which the Loss Runs
were generated.   Muse Aff. ¶¶ 14-15.

WECCO's primary challenge to the applicability of this exception is Muse's status as a qualified witness to those facts.  WECCO complains, somewhat disingenuously, that she cannot be qualified as such because "Ms. Muse never worked for St. Paul.  Rather, she has worked at Travelers [] since 1988." ECF No. 357 at 6.  This objection ignores the fact that, since January 2008, Muse oversaw and managed the handling of claims against WECCO and the supervision of the individual who has been the primary claims handler on the WECCO account since the late 1990s.  Muse Aff. ¶ 4.  She testifies that she is intimately familiar with the process and procedures by which the payment records for the WECCO account as reflected in the Loss Runs were created and maintained, that she is familiar with both the St. Paul and the Travelers computer systems and the manner in which they have been integrated, and that she has knowledge as to how records were kept and maintained prior to the corporate affiliation of St. Paul and Travelers.  Id. ¶¶ 5, 8-13, 27-30.

The Court finds that Ms. Muse is fully qualified as a witness through which the Loss Runs can be admitted under Rule 803(6).  The Court also notes, as did St. Paul in its motion, that several courts have accepted computer generated payment records, including loss runs, similar to those submitted here as evidence of exhaustion.  ECF No. 353 at 26 n.13 (citing U-Haul Intern., Inc. v. Lumbermens Mut. Cas. Co., 576 F.3d 1040, 1043-

44 (9th Cir. 2009); Suter v. Gen. Accident Ins. Co. of Am., No.
01-2686 (WGB), 2006 WL 2000881 (D. N.J. July 17, 2006), vacated
sub nom. pursuant to settlement, Goldman v. Gen. Accident Ins.
Co. of Am., 2007 WL 2781935, at *21-22 (D. N.J. May 24, 2007);
R.T. Vanderbilt Co., Inc. v. Hartford Accident & Indem. Co., No.
X02UWYCV075016321, 2014 WL 1647135, at *22 (Conn. Super. Ct.
Mar. 28, 2014)).  WECCO proffers nothing in its opposition to
distinguish these cases.

     As for the summary document submitted as Exhibit 12 to the
Muse Affidavit, St. Paul did not offer it as an admissible
business record.  Instead, St. Paul proffers that it is
admissible under Rule 1006 as a summary to prove the content of
voluminous records.  Countering WECCO's complaint that St. Paul
failed to produce Exhibit 12 in discovery, St. Paul notes that
the Rule "'requires only that the summarized documents and not
the summaries themselves, be made available to the opposing
party at a "reasonable time and place."'"  ECF No. 386 at 10-11
(quoting United States v. Dukes, 242 F. App'x 37, 49-50 (4th
Cir. 2007) (emphasis added, citation omitted); Fed. R. Evid.
1006.  It is undisputed that the documents summarized in Exhibit
12 were produced to WECCO nearly two years ago.

     Regarding the alleged failure to cross reference the
summary with document Bates numbers, WECCO provides no authority
for the proposition that such cross reference is required.

Nevertheless, Ms. Muse not only testified regarding the types of documents used to prepare Exhibit 12, but did, in fact, attach exemplary Bates numbered documents to her Affidavit.  Going yet another step beyond its obligations, St. Paul submitted a Supplemental Affidavit of Ms. Muse, ECF No. 386-1, to which she attached Exhibit 12-A, an updated summary chart cross-referenced to Bates numbered documents.  ECF No. 386-2.  Ms. Muse then attached to her Supplemental Affidavit the referenced documents. ECF Nos. 386-3 to 386-131.

Based upon this evidence which is clearly admissible, the Court concluded that St. Paul is entitled to a declaration that it has exhausted the aggregate limit of all of its policies.

As an alternative ground for summary judgment, St. Paul also argues that any claims against it in the Amended Cross Claims that relate back to its primary policies are barred by the applicable statute of limitations.  In St. Paul's view, the statute of limitations began to run with respect to those policies, at the latest, on February 21, 2003, when St. Paul notified WECCO, by letter, that the $2 million limits of liability on those policies had been exhausted by the payment of claims.  Thus, to avoid the expiration of the three-year statute of limitation, WECCO was required to file any breach of contract claim related to the primary policies on or before February 21,

2006.[9]  The claims were not asserted, however, until January 14,
2013, when WECCO filed the parallel declaratory judgment action
in the Superior Court for the District of Columbia.

There is no dispute that WECCO's breach of contract claims
are subject to Maryland's general statute of limitations and
thus must have been brought within three years of the date of
accrual.  Md. Code Ann., Cts. & Jud. Proc. § 5-101.  "Generally,
a cause of action for breach of a contract accrues, and the
statute of limitations begins to run, when the plaintiff knows
or should have known of the breach."  <u>Vigilant Ins. Co. v.
Luppino</u>, 723 A.2d 14, 17 (Md. 1999).  There is no dispute that
WECCO received the February 21, 2003, letter in which St. Paul
declared that its primary policies were exhausted.  WECCO,
however, argues that this letter was "merely an anticipatory
breach."  ECF No. 357 at 13.  The actual breach, in WECCO's
view, did not occur until February 2015, when St. Paul sent
WECCO a letter refusing to pay a specific asbestos bodily injury
claim that WECCO had tendered to St. Paul.  <u>Id.</u>

To determine which theory is correct and when the breach of
contract actually accrued, the Court must look to the Amended
Cross Claims and to the specific breach that is alleged.  In
Count 3, WECCO alleges that "U.S. Fire and St. Paul improperly

---

[9] St. Paul does not extend this argument to the Umbrella Policies
as it did not give notice that those policies were exhausted
until June 18, 2013.

allocated settled operations claims as settled completed operations claims, and subjected those claims improperly to the aggregate limit of liability in their policies" and that, as a result, "[t]his caused the aggregate limits of liability in the U.S. Fire and St. Paul policies to 'exhaust' prematurely."  ECF No. 268, Am. Cross Claims ¶ 50.  Clearly, the breach that is alleged in the Amended Cross Claims is St. Paul's misallocation of claims which, in turn, led to the premature exhaustion of limits.  The alleged breach is not St. Paul's refusal to pay a claim twelve years later.

WECCO does allege in the Amended Cross Claim that it has "suffered injury and damages as a result of this breach of contract by cross-claim defendants U.S. Fire and St. Paul, including but not limited to the amount of money that WECC[O] has spent settling Asbestos Suits following the premature exhaustion of the aggregate limits of liability in the U.S. Fire and St. Paul policies."  Id. ¶ 51.  That damages might be suffered at some point in the future, however, does not represent a new breach that restarts the limitations period.  In this regard, the Court finds instructive the Fourth Circuit's decision in Curry v. Trustmark Ins. Co., 600 F. App'x 877 (4th Cir. 2015).

In Curry, the plaintiff alleged the breach of a disability insurance contract.  The defendant insurer paid benefits for

several years but then demanded that the plaintiff insured provide some additional information concerning his condition, including submitting to an independent medical examination (IME).  After the plaintiff failed to attend the IME, the defendant denied any additional benefits effective June 30, 2008.  The plaintiff filed his breach of contract claim on July 27, 2011.  In ruling on the defendant's motion for summary judgment, the district court concluded that the plaintiff's "cause of action for breach of contract accrued anew each month benefits were not paid."  Id. at 879.  Thus, the court found that claims based upon any denial of monthly benefits after July 27, 2008 were timely.[10]

On appeal, the Fourth Circuit disagreed, rejecting this "continuing breach theory of accrual," and noting that "federal district courts in Maryland have concluded that while harm in a given case may be continuous, often there exists only a single violation of breach 'from which all of Plaintiff's harm flowed.'"  Id. (quoting Montrose Educ. Servs., Inc. v. Sylvan Learning Sys., Inc., No. RDB 06-308, 2007 WL 979923, at *5 (D. Md. Mar. 30, 2007) (quoting Ruddy v. Equitable Life Assurance Soc., No. DKC 00-70, 2000 WL 964770, at *5 (D. Md. June 20,

---

[10] The Court proceeded to grant summary judgment on those claims on the ground that it found no breach of contract in requiring the plaintiff to submit to an IME as a prerequisite for payment of benefits.  Id.

2000))). Here, while WECCO may continue to suffer damages from the alleged breach, those damages "were natural consequences of the breach and only affected the extent of the injury Plaintiff would sustain as a result of the alleged breach. They did not constitute separate breaches that started the limitations period anew." Ruddy, 2000 WL 964770, at *5.

The Court believes that the conclusion that limitations began to run when St. Paul declared the exhaustion of its aggregate limits in February 2003 is also most consistent with the purpose of statutes of limitations. "Statutes of limitations are designed primarily to assure fairness to defendants on the theory that claims, asserted after evidence is gone, memories have faded, and witnesses disappeared, are so stale as to be unjust." Bertonazzi v. Hillman, 216 A.2d 723, 726 (Md. 1966). WECCO's attempt in this current litigation to go back and reconstruct and analyze the nature of the allegedly mischaracterized and misallocated claims, years after those claims were resolved, only highlights this fundamental unfairness, particularly when WECCO could have raised all of its current arguments when St. Paul announced years ago the exhaustion of its policy limits.

To avoid the bar of limitations, WECCO relies heavily on Lane v. Nationwide Mutual Insurance Company, 582 A.2d 501 (Md. 1990), and Commercial Union Insurance Company v. Porter Hayden

Company, 698 A.2d 1167 (Md. Ct. Spec. App. 1997).  The Court

finds those cases inapposite.  In both of those cases, the

alleged breach related to an insurance claim that was ongoing

and the cases stand for the straightforward proposition that

limitations do not begin to run until the breach occurs, i.e.,

until that pending claim is denied.  In Lane, the plaintiff

alleged an insurance contract was breached by the denial of

uninsured motorist benefits and the court held that limitations

did not begin to run until the insurer denies that claim, as it

was that denial that was the actual breach.  582 A.2d at 507.

In Commercial Union, which was a declaratory judgment action,

the dispute was whether the defendant insurer's policies

provided "product hazard" coverage in several pending cases.

Following Lane, the court held that "the Statute of Limitations

will not begin to run on a suit by the insured against the

insurer for the breach of the contractual duty to indemnify

until that breach literally occurs," and the breach would not

literally occur until judgment was entered against the insured

in the underlying cases and coverage for that judgment was

actually denied.  698 A.2d at 1189-90.

Here, as noted above, the alleged breach was the long-ago

mischaracterization of claims.  WECCO was fully aware of that

breach as of February 2003.  Accordingly, the Court finds that

WECCO's current claims and any other claims based upon the

alleged premature exhaustion of St. Paul's primary policies are time barred.[11]

Finally, in Count 2 of WECCO's Crossclaims, WECCO alleges that St. Paul breached its policies by refusing "to pay in full defense costs related to WECC[O]'s defense of the Asbestos Suits covered by the relevant policies." ECF No. 268 ¶ 43. WECCO seeks $151,913.62 in damages — the amount it claims was paid by the WECCO QSF to former defense counsel, Messrs. Flax and Spinelli, in connection with the defense of certain WECCO Asbestos Claims. ECF No. 353-4, WECCO's Rule 30(b)(6) Dep. at 93-94. WECCO further contends that each of the non-settled insurers (i.e., St. Paul, Continental, and U.S. Fire) are jointly and severally liable for this amount. Id. at 203.

In moving for summary judgment on this claim, St. Paul argues that there is no evidence in the record supporting WECCO's claim that St. Paul has failed to defend any action covered under one of its policies or failed to pay WECCO defense cost for a covered claim. WECCO has submitted no evidence identifying the specific asbestos claims for which WECCO allegedly paid defense costs and for which St. Paul was obligated to defend WECCO, but failed to do so. In addition,

---

[11] St. Paul notes that it is not contending that WECCO may not assert, within the three year limitations period, that St. Paul owes coverage for an alleged "operations" claim which would not be subject to the aggregate limit. ECF No. 386 at 17 n.16.

St. Paul notes that WECCO's lack of any evidence as to any damages related to this claim was the subject of a motion to compel, ECF No. 310-2, which the Court granted.  ECF No. 329. St. Paul also adds that it is undisputed that St. Paul has paid more than $4.5 million for the defense of WECCO asbestos claims.[12]

WECCO's response to this argument is somewhat incomplete and elusive.  In its 30(b)(6) Deposition, WECCO states that it paid Flax and Spinelli "$151,000 and change" in 2015 and that St. Paul was obligated to pay that entire amount.  WECCO's Rule 30(b)(6) Dep. at 94, 102.  WECCO also submits the Annual Fund Accounting Reports for the years 2013 – 2016, ECF No. 357-6, but nothing on those pages corresponds with the $151,913.62 figure now claimed.  For the year 2015, there is a single figure of $3,517,303 for "Legal Fees" but with no further explanation for the source of that figure.  One last document, "WECC QSF LLC, October 31, 2013 through January 15, 2016," contains three line items, one for "Gross payments – legal defense costs" with the figure "$151,913."  ECF No. 353-11.

---

[12] St. Paul raises an additional argument that WECCO has made judicial admissions that the defense costs that it now seeks to recover from St. Paul are costs that are allocable to the insurers that have settled with WECCO and in whose shoes WECCO now stands.  While the Court need not reach this issue as it finds on other grounds that St. Paul is entitled to summary judgment on this claim, there is at least some ambiguity in WECCO's statements as to whether the defense cost are allocable exclusively to the settled insurers.

The Court finds WECCO's proffered evidence woefully inadequate to support this claim for defense costs.  When presented with essentially the same evidence regarding this claim in St. Paul's Motion to Compel, the Court concluded that WECCO has "provided no explanation as to how it arrived at these figures [for the alleged defense costs] and provides no documentation to support them."  ECF No. 329 at 4.  The Court also noted that under the Operating Agreement for WECCO's QSF, supporting documentation should exist and ordered WECCO to produce that documentation.  Id.  The Court cautioned that should WECCO fail to do so, it would be precluded from introducing evidence in support of its damage claim absent a showing of exceptional circumstances."  Id.  In response to that order, WECCO states that it produced the four page WECCO QSF Annual Fund Accounting Records, referenced above, and "another 500 pages of additional damage documents."  ECF 357 at 17.  St. Paul counters in its reply that those 500 pages of documents all related solely to indemnity issues and had nothing to do with defense costs.  Significantly, while WECCO trumpets that it produced 500 pages of documents in response to the Court's order, it did not submit a single page of those documents with its opposition.

The Court will grant St. Paul's motion as to Count 2 of the Cross Claims.

32

## B. U.S. Fire Policies

Similarly to St. Paul, U.S. Fire seeks a declaration that it has exhausted the aggregate limits of its policies and that it is entitled to summary judgment as to Count 3 of WECCO's cross-claim.  U.S. Fire contends that it is also entitled to summary judgment as to Count 2 as it has paid more than what is was required to pay based on its time on the risk.[13]

U.S. Fire issued the following policies to WECCO: a primary policy effective from May 1, 1975 to April 1, 1976 with an aggregate limit of $300,000 for completed operations and product claims; an excess/umbrella policy effective from May 1, 1975 to April 1, 1976 with an aggregate limit of $2 million for completed operations and product claims; an excess/umbrella policy effective from June 29, 1976 to April 1, 1977 with an aggregate limit of $2 million for completed operations and product claims; and an excess/umbrella policy effective from April 1, 1978 to April 1, 1979 with an aggregate limit of $2 million for completed operations and product claims.  There is no dispute that U.S. Fire notified WECCO of the exhaustion of

---

[13] U.S. Fire also notes that there does not appear to be anything left of WECCO's declaratory judgment claim in Count 1 as all of the prayed-for declarations have been addressed by previous rulings of this Court, with the exception of the declaration that the asbestos claims against WECCO arise from multiple occurrences, not single occurrences.  Because, as noted above, no insurer took the position that the claims arose from a single occurrence, there appears to be no justiciable controversy on this issue.

the aggregate limits of the U.S. Fire primary policy in July 2003, and of the exhaustion of the U.S. Fire umbrella policies in January 2009.  While WECCO received continued correspondence over the years from U.S. Fire declaring that U.S. Fire had concluded that its policy's limits were exhausted, WECCO never challenged this conclusion until August 10, 2015, when it moved to file its Amended Cross Claims against U.S. Fire.  ECF No. 260.

Under the same reasoning that the Court concludes that claims in Count 3 of the Amended Cross Claims arising from St. Paul's primary policies are barred by the statute of limitation, the Court concludes that the claims against U.S. Fire arising from its primary policies and umbrella policies are similarly time barred.[14]  Like the alleged breaches by St. Paul, the alleged breaches by U.S. Fire were the alleged misallocations of claims which led to the alleged premature exhaustion of aggregate limits under the policies.  Causes of action for those breaches accrued in 2003 for the primary policy and 2009 for the umbrella policies and yet no claims were asserted until 2015.[15]

---

[14] Like St. Paul, U.S. Fire notes that it is not contending that WECCO may not assert, within the three year limitations period, that U.S. Fire owes coverage for an alleged "operations" claim which would not be subject to the aggregate limit.  ECF No. 377 at 16.

[15] The evidence in the record actually demonstrates that U.S. Fire has significantly overpaid WECCO settlement claims in

As to WECCO's claim against U.S. Fire in Count 3 for defense costs, U.S. Fire represents that it has actually paid more than its proportional share of those costs.  Although it concluded that it had exhausted its aggregate policy limits, because of vagueness in the allegations in the complaints against WECCO, U.S. Fire again began participating in the defense of asbestos claims against WECCO beginning in July 2013.  U.S. Fire continued to pay at least a 1/6 share of the invoices of defense counsel until October 2015, when WECCO's counsel in this litigation took over the control of the defense of the underlying claims.  U.S. Fire paid over $200,000 in defense costs during this time period.  ECF No. 343-1, Stacchi Aff. ¶ 21.  Based upon the 11 month time on the risk under its primary policy, U.S. Fire's pro rata share of defense costs was significantly less.

As it did in opposing St. Paul's motion as it related to defense costs, WECCO simply repeats that it paid Flax and Spinelli $151,913 but provides no supporting documentation for that figure or explanation as to why this was more than WECCO was required to pay "in the shoes" of the settled insurers.

proportion to its time on the risk.  On that basis, U.S. Fire indicated that it would seek leave to amend its answer to add a recoupment defense should the Court reach the merits of WECCO's breach claim and find that U.S. Fire had misallocated one or more settlement claims.  Because the Court finds WECCO's claims are time barred, it need not reach the issue of whether U.S. Fire should be permitted to amend its answer.

More significantly, WECCO does not dispute that U.S. Fire paid over $200,000 in defense costs during this period nor explain why this amount was less than its pro rata share.  U.S. Fire's motion will be granted as to this claim as well.

### C. Continental Policies

Continental moves for summary judgment on Count 1, seeking a declaration that the aggregate limits of liability for products and completed operations claims under the policies for which Continental is allegedly responsible have been exhausted, and that the claims settled to date by WECCO are subject to the aggregate limits of such policies.  Continental also moves to dismiss Count 2, asserting that there is no evidence that it paid less than its pro rata share of defense costs.  As noted above, Count 3 is not asserted against Continental.

Continental had potential liability for WECCO claims under three insurance policies.  Continental, through its predecessor, Fidelity & Casualty of New York, issued a primary general liability policy for the period from November 19, 1972, to March 1, 1973, with an annual aggregate limit of $300,000 applicable to damages for bodily injuries caused by a "products hazard" or "completed operations hazard."  Continental is also alleged to be financially responsible for a primary general liability policy issued by Atlanta International Insurance Company (Atlanta International) for the period from March 1, 1973, to

36

March 1, 1974, with an identical aggregate limit.  On May 16,

2014, WECCO and Continental entered into an agreement providing

that certain payments totaling $600,000 made by Continental in

connection with the settlement of asbestos claims against WECCO

fully exhausted the alleged aggregate limits under these two

policies.  WECCO acknowledged in its discovery responses that it

is no longer pursuing claims related to these policies.

Continental also issued a primary general liability policy

for the period from November 19, 1972, to November 19, 1975.

This policy had an aggregate limit of $25,000 for completed

operations hazard and product hazard claims.  On June 16, 2000,

Continental notified WECCO that with a payment that it was then

making in settlement of an asbestos claim against WECCO it will

have paid out the $75,000 combined aggregate limit[16] under the

policy, and further advised WECCO that it would no longer be

participating in WECCO's indemnity payments or defense costs.

There is no dispute that WECCO received this notice.  WECCO,

however, did not dispute that the aggregate limit of this policy

had been exhausted until it sought leave to amend its Cross

Claims on August 10, 2015.

---

[16] Continental's claim representative treated the $25,000
aggregate limit as an annual limit, thus resulting in the
payment of $75,000 under this policy towards that limit.
Continental now asserts that it was a single aggregate limit and
it essentially overpaid by $50,000.  See ECF No. 346 at 14 n.10.

Continental notes in its motion that in WECCO's Rule 30(b)(6) deposition, WECCO's president, Raymond Tellini, testified that WECCO had not identified any payment that Continental had improperly characterized with respect to exhausting the aggregate limit of this policy.  ECF No. 346 at 6 (citing WECCO's Rule 30(b)(6) Dep. at 198-99).  In response to questions about improper allocation of operations claims, Tellini testified "[t]hat is not an argument anymore."  Id. at 207.  With that argument now abandoned, WECCO makes the spurious argument in its opposition that Continental has proffered insufficient evidence that it actually made $75,000 in settlement payments.  ECF No. 363 at 2.  Just as it did with the Loss Runs submitted by St. Paul, WECCO challenges the evidence that was offered by Continental, asserting that it is inadmissible hearsay.  Just as the Court found concerning the evidence offered by St. Paul, the Court finds that the declaration and testimony of Tricia Daziel, the claim representative responsible for handling asbestos claims against WECCO on behalf of Continental, is admissible and more than sufficiently establishes the payment of claims that exhausted the aggregate limit.

Regardless, the Court also finds that WECCO's request for any declaration that Continental prematurely declared the exhaustion of those limits is barred by the statute of

limitations. To determine when a declaratory judgment action "accrues" for purposes of applying the Maryland statute of limitations, a court must look to the accrual of the underlying "coercive" cause of action (such as breach of contract). Commercial Union, 698 A.2d at 1192-93. "[I]f declaratory relief is sought with reference to an obligation which has been breached and the right to commence an action for 'coercive' relief upon the cause of action arising therefrom is barred by the statute, the right to declaratory relief is likewise barred." Id. at 1193. The alleged breach accrued in June 2000 and WECCO's claim was not asserted until more than 15 years later, long after the three year statute of limitations expired.

The Court also finds that Continental is entitled to summary judgment on Count 2. With its motion, Continental has presented admissible evidence that it has paid over $300,000 with respect to WECCO's defense. Furthermore, WECCO's 30(b)(6) designee testified that WECCO could not identify any asbestos suit where Continental had failed or refused to defend or reimburse to the full extent required by the relevant policies, admitting that WECCO's initial allegation that Continental had failed to defend had been "subsequently proven to be incorrect." WECCO's Rule 30(b)(6) Dep. at 201-02. WECCO offered no defense of Count 2 in its opposition to Continental's motion, thus,

abandoning the claim.  See Grant-Fletcher, 964 F. Supp. 2d at 526.

**D. Claims Against PCIGC**

The Maryland Insurance Code deems PCIGC the insurer for statutorily defined "covered claims" resulting from the insolvency of certain insurers, and, to the extent of statutorily assigned obligations, PCIGC has "the rights, duties, and obligations that the insolvent insurer would have had if the insurer had not become insolvent."  Md. Code Ann., Ins. § 9-306(c).  In WECCO's Amended Third Party Complaint, WECCO sought to hold PCIGC liable for two now insolvent insurance companies: American Mutual Insurance Company (American Mutual), and Centennial.  In a previous ruling, this Court concluded that PCIGC was not liable for any claims against American Mutual because WECCO provided no notice of any claims prior to the statutory bar date.  ECF No. 251 at 30.  The Court also held that PCIGC would only be liable for claims against Centennial that were noticed before the applicable bar date of October 27, 2012.  Id.  Assuming without acknowledging that there could be such permitted claims, PCIGC has moved for summary judgment arguing, inter alia, that WECCO cannot produce the alleged Centennial policy or evidence of the terms and conditions of that policy.

In the Amended Third Party Complaint, WECCO alleged that
PCIGC was liable for the payment of claims under a <u>primary</u>
comprehensive general liability policy issued by Centennial for
a coverage period from March 1, 1973, to March 1, 1974.  ECF No.
268 at ¶ 24.  As noted above, WECCO also alleged that Atlanta
International had issued a primary policy for this same period,
a policy for which it alleges Continental is now liable.  <u>Id.</u> ¶
23.  In its answers to interrogatories, WECCO identifies the
Atlanta International policy as a "missing" primary policy, ECF
No. 340-2 at 6, but identifies the Centennial policy as simply
"missing," without designating whether it was a primary or
excess policy.  <u>Id.</u> at 5.  WECCO also referenced in its answers
to interrogatories and produced in discovery three pages that it
purports to be related to the Continental policy: a Certificate
of Insurance dated March 1, 1973, and two items of
correspondence related to that Certificate of Insurance.  ECF
No. 340-3 (WECCO 000409 - 000411).  As fact witnesses related to
PCIGC's potential liability, WECCO identified four witnesses,
but none were identified as having knowledge of the existence,
terms, or conditions of either policy.

One of those fact witnesses was Michael Gibbons, a former
President and current Assistant Secretary of WECCO.  When asked
about the three pages identified as WECCO 000409-000411 in his
April 26, 2016, deposition, Gibbons testified that he had never

seen those pages before, that he had no prior knowledge of a Centennial Insurance policy issued to WECCO, and had no information as to how this alleged policy was discovered. ECF No. 340-6, Gibbons Dep. at 217-18. In his August 11, 2016, declaration, however, which WECCO had prepared in response to PCIGC's motion and submitted with its opposition, Gibbons now states that these documents "were located in the business records of WECC" and "were found in a condition that does not create a suspicion about their authenticity and they were found in a place where WECC's historic insurance documents would likely be located." ECF No. 366-7 at 1-2. He states further that, "[t]o the best of my recollection, I found [these documents] in WECC's business files with other historic insurance documents." Id. at 2.

Also with its opposition, PCIGC submitted a "declaration sheet" and "cancellation notice," that were attachments to a June 29, 2012, letter from PCIGC's counsel to Gibbons. ECF No. 366-2 (CIC-003331 to CIC-003333). PCIGC's counsel states in his letter that the declaration sheet and cancellation notice were received from the New York Liquidation Bureau. The declaration page identifies the policy as an umbrella policy, not a primary policy. The cancellation notice states that the cancellation of the policy was effective March 1, 1974.

With its opposition, WECCO also submitted several
additional documents, never disclosed in discovery, that it
maintains gives further evidence not only of the existence of
the Centennial policy issued to WECCO, but also of the terms of
that policy.  ECF No. 365-4 (CEN00310 to CEN00315).  These
documents appear to be related to a civil action filed in the
United States District Court for the District of Massachusetts
in 1997, Invensys Systems v. Centennial Insurance Company, Civil
Action 97-6184.  One of those documents, CEN00310, is an April
4, 2000, letter from "John E. Yandrasitz," Associate Corporate
Counsel for the Atlantic Mutual Companies (which includes
Centennial), in which he states, "[e]nclosed is what we believe
to be a copy of the generic policy wording for the identified
Centennial umbrella policy.  We cannot tie them together with
certainty but based upon information and belief, we believe that
the enclosed specimen wording was utilized in the policy in
question."  CEN00310 (emphasis added).[17]  Document CEN00311 to
CEN00315 is the attached policy form which is dated "3/1/69 to
3/1/72."

---

[17] In its opposition, WECCO chose to quote the letter with a
different emphasis.  "'[E]nclosed is what we believe to be a copy
of the generic policy wording for the identified Centennial
umbrella policy.  We cannot tie them together with certainty but
based upon information and belief, we believe that the enclosed
specimen wording was utilized in the policy in question.'"  ECF
No. 366 at 13.

WECCO acknowledges in its opposition that, prior to the filing of PCIGC's motion, "it did not possess a copy of the terms and conditions of the Centennial policy."  ECF No. 366. In order "[t]o oppose PCIGC's motion, however, its attorneys searched the public domain," and found these documents from the Invensys case on the Massachusetts court's PACER system.  Id. As PCIGC observes, however, these documents have been on PACER since 2006 and could have been found by WECCO's counsel long ago.  Because WECCO did not disclose these documents until after discovery had closed, PCIGC was precluded from conducting any discovery concerning those documents.

In an action on an insurance policy, the insured bears the burden of proving every fact essential to his or her right to recovery, ordinarily by a preponderance of the evidence.  North Am. Acc. Ins. Co. v. Plummer, 176 A. 466, 469 (Md. 1935).  When coverage is sought for missing policies, however, the proponent of a lost document has the burden of proving its existence and terms by 'clear and positive' evidence."  Lowry's Reports, Inc. v. Legg Mason, Inc., 271 F. Supp. 2d 737, 757 (D. Md. 2003) (citing Barranco v. Kostens, 54 A.2d 326, 328 (Md. 1947)). "Maryland courts have not yet clarified whether the 'clear and positive' standard approximates the 'mere preponderance' standard or the 'clear and convincing' standard,"

44

<u>Klopman v. Zurich Am. Ins. Co. of Illinois</u>, 233 F. App'x 256, 258 (4th Cir. 2007), and this Court has sometimes chosen one standard and sometimes the other.  <u>Compare</u> <u>Lowry's Reports</u>, 271 F. Supp. 2d at 757 n.3 (D. Md. 2003) (assuming that the standard requires clear and convincing evidence), with <u>Klopman v. Zurich Am. Ins. Co.</u>, No. Civ. WDQ-04-2529, 2005 WL 1367080, at *2 n.5 (D. Md. June 7, 2005) (assuming that the standard requires "substantially more than a preponderance").  Regardless of which standard is adopted, for WECCO to sustain its claim, the "evidence must at least 'leave no reasonable doubt' as to the existence <u>and the terms and conditions</u> of the insurance policy." <u>Klopman</u>, 233 F. App'x at 258-59 (emphasis added).

    The Court finds that WECCO cannot meet that standard.  The discrepancies between Gibbons' testimony in his deposition and the statements in his declaration regarding his knowledge of the three pages on which WECCO initially relied in support the existence of the policy undermine his ability to authenticate those documents.  Nevertheless, in light of the submission of the "declaration sheet" and "cancellation notice" forwarded to Gibbons by PCIGC's counsel, the Court will assume, for purposes of this decision, that WECCO could establish the existence of the Centennial policy.  The Court, however, finds no admissible evidence as to the material terms and conditions of the policy.

The evidence WECCO has submitted as to the terms and
conditions of the policy, CEN00311 to CEN00315, is inadmissible
for several reasons.  First and foremost, WECCO failed to
produce that evidence in discovery and has offered no
explanation for its failure to do so.[18]  Under Rule 26, "[a]
party who . . . has responded to an interrogatory . . . must
supplement or correct its disclosure or response: (A) in a
timely manner if the party learns that in some material respect
the disclosure or response is incomplete or incorrect, and if
the additional or corrective information has not otherwise been
made known to the other parties during the discovery process or
in writing[.]"  Fed. R. Civ. Proc. 26(e)(1)(A).  If a party
fails to supplement a response as required under Rule 26(e),
"the party is not allowed to use that information on a motion,
at a hearing, or at a trial, unless the failure was
substantially justified or is harmless."  Fed. R. Civ. Proc.
37(c)(1).  In determining whether a nondisclosure of evidence is
substantially justified or harmless, courts look to the
following factors: (1) the surprise to the party against whom
the evidence would be offered; (2) the ability of that party to
cure the surprise; (3) the extent to which allowing the evidence

---

[18] The obvious explanation for the failure to produce these
documents in discovery is that counsel admittedly did not make
any effort to find these documents until discovery was closed
and PCIGC had filed its motion.

would disrupt the trial; (4) the importance of the evidence; and (5) the non-disclosing party's explanation for its failure to disclose the evidence.  Southern States Rack and Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 597 (4th Cir. 2003).

There is no question that this evidence would have been responsive to PCIGC's interrogatory which sought the identity of all documents supporting WECCO's contentions regarding the limits of liability, terms, conditions, and exclusions of the Centennial policy.  ECF No. 340-2 at 7.  There is also no question that this evidence, if actually relevant to the Centennial policy issued to WECCO, would be important evidence. The terms and conditions of the policy are obviously critical to WECCO's claim against PCIGC and this evidence is the only potential evidence as to those terms and conditions.  PCIGC filed its motion on the ground that there was no evidence disclosed in discovery regarding those terms and conditions and thus, was certainly surprised when this new evidence suddenly materialized with WECCO's opposition.  The implicit explanation for the failure to disclose this evidence, i.e., that counsel simply did not look for it until after PCIGC filed its motion, is not compelling.

The untimely disclosure aside, the evidence is also inadmissible as hearsay.  WECCO offers Yandrasitz's letter to establish that the attached policy form is the generic policy

language that would have been included in the policy at issue in
Invensys and, by extension, in the Centennial umbrella policy
issued to WECCO.  As such, the letter is an out of court
statement offered to prove the truth of the matters asserted in
that letter and, thus, it is clearly hearsay.  Furthermore,
without the letter, there is nothing to authenticate the
attached document, so that document is also inadmissible.

Finally, the Court concludes that, notwithstanding its
inadmissibility, the proffered evidence is irrelevant as to the
Centennial policy issued to WECCO.  The Court notes that even
Yandrasitz's connection of the policy form to the policy at
issue in Invensys was qualified.  He states that the enclosed
policy form is what "we believe to be" the generic policy
wording" but "[w]e cannot tie them together with certainty."
ECF No. 365-4.  Furthermore, even this qualified connection is
expressly limited to "the identified Centennial umbrella policy"
at issue in that litigation and "the policy in question."  Id.
It would be an impermissible leap to conclude, based only on the
Yandrasitz letter, that the terms and conditions in this policy
form were the terms and conditions in the WECCO policy.[19]

---

[19] The Court also finds it significant that, in the cases relied
upon by WECCO, a policy form is used to reconstruct the terms
and conditions of a missing policy sought to be enforced against
the issuing insurance company.  Here, WECCO is attempting to
enforce the policy against a guarantor with limited obligations
and no privity with the insolvent insurer and no first-hand

## IV. CONCLUSION

For the above stated reasons, the Court will deny WECCO's motion for reconsideration and partial summary judgment but will grant the dispositive motions filed by St. Paul, U.S. Fire, Continental, and PCIGC.  It would appear that, with this ruling, most if not all of the substantive issues in this litigation have been resolved.  The Court instructs the Parties to meet and confer and submit a status report within ten days of this date informing the Court as to what remains to be resolved in this action.

A separate order will issue.


_____/s/_____
William M. Nickerson
Senior United States District Judge


DATED: March 10, 2017

_____
knowledge or information about the terms and conditions of the missing policy.